[No. 12794. Department Two. December 3, 1915.]

THE CITY OF BREMERTON, *Appellant*, v. BREMERTON WATER & POWER COMPANY, *Respondent*, GARRISON-FISHER COMPANY, *Respondent-Intervener*.[1]

APPEAL—BOND—TIME OF FILING—NECESSITY ON CROSS-APPEAL. Under the statute providing that an appeal shall become ineffectual for any purpose unless the appeal bond be filed within five days, a cross-appeal must be dismissed where the bond, though executed in time, was not lodged in the clerk's office until seven days after filing the cross-appeal, as the cross-appeal is an independent proceeding.

APPEAL—REVIEW—RIGHT TO ALLEGE ERROR—DISMISSAL OF CROSS-APPEAL. Errors assigned by a cross-appellant cannot be considered after dismissal of the cross-appeal, even in an equity case tried *de novo* on appeal.

WATERS AND WATER COURSES—WATER COMPANY—ACQUISITION BY CITY—PAYMENT—TIME OF TRANSFER—POSSESSION AND PROFITS. Where a city decided to purchase a waterworks plant, and had not the present means to pay for it, and bonds to raise the money must be ratified by vote of the people, the company is entitled to the possession and profits of the plant until it is paid for.

SAME—ACQUISITION OF WATERWORKS BY CITY—VALUATION—"ACTUAL COST"—FRANCHISES—CONSTRUCTION. Under a clause in a water company's franchise requiring mains to be lowered at the "company's expense," such expense is part of "the actual cost" of the plant,

[1]Reported in 153 Pac. 372.

within the clause fixing the price at which the city could purchase, where there was abundant expert evidence that it was a "plant" cost and not an operating expense.

SAME. The same would be true of the installation of meters which will pass to the city, and which were paid for by the company in the water allowance to consumers.

SAME—VALUATION OF PLANT—"OVERHEAD CHARGES." Where, six years prior to the acquisition of a water plant by a city, the books of the construction company showed the cost to be $63,190, and it was purchased by individuals interested in the company for the price of $70,000, the difference, $6,810, should not be allowed as part of the "actual cost" of the plant to be paid by the city, upon the claim that it was a reasonable sum as overhead charges which had not been entered on the company's books; in view of the lapse of time and the interest of the individuals in the company, and lack of precision in the evidence, which disclosed that the apportionment of the company's overhead charges on this and similar projects was speculative.

SAME — VALUATION OF PLANT — INTEREST DURING CONSTRUCTION. "Interest during construction" upon additions to a waterworks system, paid for out of earnings of the plant and personal advances by the owners without issuing bonds or incurring general loans, is properly allowed as part of the "actual cost" of a water plant, upon its acquisition by a city.

SAME—VALUATION—COST OF ADDITIONS—TENDER. Upon the acquisition of a waterworks plant by a city, under its right to purchase the same at "actual cost," the expense of additions to the plant after notice of purchase had matured but before tender is properly part of the cost.

SPECIFIC PERFORMANCE—CONTRACTS SUBJECT TO—AMBIGUITY—TENDER OF ABILITY TO PERFORM. Specific performance of a clause in the franchise of a water company, wherein it engaged to sell the plant to the city, will not be decreed, where the contract was not free from ambiguity, and the city's announcement of its intention to purchase was a doubtful compliance with the contract, and the city did not tender the price and was not ready and of present ability.

SAME—DECREE—SCOPE OF RELIEF—CONDITIONS. In an action for specific performance of a clause in the franchise of a water company, wherein it engaged to sell the plant to the city, the court has no authority to order a bond election, which was necessary to raise the money to pay the purchase price, although it can fix the time within which tender shall be made.

Cross-appeals from a judgment of the superior court for King county, Ronald, J., entered March 27, 1915, in favor of

the plaintiff, in an action for specific performance, tried to the court. Defendant's cross-appeal dismissed; modified on plaintiff's appeal.

*Bryan & Colvin*, for appellant.

*Kerr & McCord* and *Piles & Howe*, for respondents.

BAUSMAN, J.—In 1902 the town of Bremerton, now a city of the third class, granted to H. Orchard and his assigns a thirty-year franchise for the sale of water to the town and its inhabitants. The contested feature in this franchise was § 2, of which we have italicized the most material portions:

"The rights hereby granted to the said grantees by the first section of this ordinance shall be for the period of *thirty* years after the passage and approval of this ordinance and after the acceptance of the same by the grantees. Provided, however, that *at the expiration of ten years from the date* of the acceptance of this franchise for the said system of waterworks, the *town of Bremerton, or its legal successors, shall have the right to purchase* the entire system of waterworks, herein authorized and provided for, *at the price upon which said system at the expiration of said ten years and at the time of the proposed purchase, is paying eight per centum, net, per annum, or twelve and a half (12½) times the net annual revenue* at the expiration of ten years, taking as such annual revenue the average *for three years, including the tenth year.* Providing, that if the town of Bremerton and H. Orchard, his heirs, successors and assigns, shall be *unable to agree* upon the price to be paid for the plant at the expiration of ten (10) years, *then the price shall be determined by appraisers* to be selected as follows, viz.: The owner or owners of said plant to name one, the town of Bremerton to name another, these two to select a third; but none of such appraisers shall be residents or owners of any property in the town of Bremerton, or the owners of any stock of the corporation owning said plant at the time of the selection or of any action taken in the premises *and the price to be agreed upon* and fixed *by said appraisers shall not exceed ten (10) per cent above the actual cost of said plant, including the cost of betterments* that may have been added thereto; provided, also, that in estimating the value of said plant the

value of right-of-way or any other concession hereby granted shall not be considered."

Orchard assigned this franchise to the Pacific Coast Pipe Company, which in turn assigned it in 1906 to Messrs. Garrison and Fisher (not to be confounded with the incorporated respondent intervener). These persons assigned it to the Bremerton Water & Power Company, respondent, and finally that corporation assigned it to the incorporated respondent and intervener, Garrison-Fisher Company.

In 1912 the city, resolving to buy this plant, passed the following resolution, a portion of which also we have italicized:

"Resolved, That it is the intention of the city council to avail itself of its option to buy the said plant and that the city of *Bremerton stands ready to pay* to the Bremerton Water & Power Company for the same, *the actual cost of said plant, plus ten per cent* as in the said franchise provided. *The said amount to be determined* by the finding that may be made *by the Public Utilities Commission* of Washington as the actual cost of same. If the said Bremerton Water & Power Company will not abide by the finding of the said commission, the city council stands ready to arbitrate the matter under the provisions of the said franchise and is now prepared to name its arbitrator.

"Resolved further, that a copy of this resolution shall be delivered to the local manager of the said Bremerton Water & Power Company, and the said company is hereby requested to reply thereto at the next meeting of this council, in order that the council may make such preparations as may be necessary to complete the said purchase."

Controversies arose not only as to the right of the city to buy at all, but as to the basis of payment as well, the city becoming plaintiff in this, an action for specific performance. The lower court, on March 27, 1915, sustained the city's action on condition of its paying respondent $219,-552.30 before July 1, 1915. From this decree the city appealed as allowing too much, and the respondent cross-appellant as allowing too little.

The cross-appeal raised also questions more radical, but we are compelled to dismiss that on motion of the other side, because the bond in support of the cross-appeal was not filed within the time required by law. Apparently seasonably executed, it was not lodged in the clerk's office until seven days after the filing of the cross-appeal. This is too late. The law leaves us no option, for it provides that an appeal shall be ineffectual for any purpose unless the bond be filed within five days. From the statutory language, cross-appellant seeks escape by contending that it relates to appeal and not to cross-appeal. With this contention we cannot agree. A cross-appeal is wholly an independent proceeding, and the jurisdiction which this court obtains by the other party's appeal is, even in equity where we review *de novo*, a jurisdiction to review only so much of the decree as that appeal has brought to us. In the remainder appellant acquiesces, and so does the respondent except as it properly cross-appeals. *Tacoma v. Tacoma Light & Water Co.*, 16 Wash. 288, 47 Pac. 738; *Whiting v. Doughton*, 31 Wash. 327, 71 Pac. 1026; *In re Littlefield*, 61 Wash. 150, 112 Pac. 234. Nor do we find anything in the decisions of this court which would enable us to consider any assignments of error of the cross-appellant after dismissing its appeal. The cross-appeal is dismissed.

Respondent in turn has moved to dismiss the principal appeal on the ground that, by appellant's actions after the decree below, the city has both acquiesced in it and taken steps to enjoy its benefits. Some circumstances lend color to such an inclination on the part of the city, but we do not find facts sufficient to warrant such a conclusion. Without discussing this point further, we overrule the respondent's motion to dismiss.

These rulings confine us to the grievances of the appellant city, which demanded specific performance of sale on the clause "cost plus ten per cent." As for the respondent intervener, that party did, by cross-complaint (after some pre-

liminary opposition to sale at all), pray also for specific performance. But this it based upon the clause "twelve and a half (12½) times the net annual revenue," and it demanded $289,616.66. In other words, the city claimed the second, the owners the first, clause of the franchise. The lower court measured by the former and so far held with the city, but it imposed a price of which the city complains.

The question now is simply one of price and, by the failure of the cross-appellant's appeal, we are confined to the clause adopted by the lower court, "cost plus ten per cent." Before considering the ingredients of that price, we may discuss a general question which runs through appellant's entire argument. The city's contention is that no tender was necessary before suit; that, from the time of its decision and announcement to buy, the property in equity belonged to the city; and that, from April 7, 1912, the city should be allowed the profits of the plant. But even if precedent tender be not necessary to sustain this action (a question which has now disappeared with the cross-appeal in any event and which possibly disappeared when the cross-complaint was filed), it does not follow that tender can be ignored in dating valuation. The city admittedly did not have the means ready for a purchase when it began this action, nor has it ever had them since, and this court must assume that it could raise this money only by issuing bonds which might be refused by the people at the polls or fail of sale in the market. Without reckoning, then, delays from the opposition of the owner, we must bear in mind the uncertainty of the purchaser. The owner is clearly entitled to possession until the purchaser is actually ready to pay, for the property is his until he is paid. By some accident, the plant might be ruined or extensively impaired, in which event the city would surely not accept it. Accordingly, the owner, having the burdens of ownership, is surely entitled to its profits.

It is also asserted that there have been excessive and exorbitant rates which should be reckoned against the owner

in fixing the price. For this statement, we find no warrant in the record. On the contrary, the public service commission had a hearing on this subject and adjudged these rates to be fair.

Coming to the several items which appellant seeks to have revised here, we must remark that they have all been patiently established by a referee with the aid of experts on both sides and with much valuable data from the public service commission, that they were severally confirmed by the lower court, and that we find nothing in the testimony to warrant our disturbing them as decided facts. In so far, however, as they were adjudicated on principles of law, we shall now examine them. What the lower court did was, after separately establishing items, to fix an aggregate of $199,593, and adding the ten per cent, it made the total purchase price $219,552.36, as of August 1, 1914, from which date it reckoned the sale. Upon that there was decreed six per cent interest to the owner until actual payment, and an accounting on the intermediate receipts and disbursements. We shall now take up the items in the order in which they are attacked by appellant.

I. Eleven thousand and forty-three dollars is complained of as wrongfully allowed the owner for the lowering of mains during street grading, and appellant, with much confidence, cites the following admitted provision of the franchise:

"That all mains and laterals to be laid two feet below grade, and that where it is not possible to lay said mains below grade, they are to be laid two feet below the surface of the ground, and to be relaid at the company's expense after grading; that the surface of the ground is to be put in as good condition after laying the mains and laterals as before."

The words "at the company's expense," appellant argues, are palpably in conflict with the lower court's allowance of this item. But appellant's argument is based on confusion of terms. Were a third person, instead of Bremerton, under

engagement to buy this plant "at actual cost," the owner surely could prove that the cost of the plant was the greater through the mains he had had to lower, a contention that would have to be determined by the general practice of auditors in public service corporations. In a word, Is the lowering of mains an operating expense or a plant cost? The mere provision here, that this was to be done at the owner's expense, means no more than that it is not to be done by taxation, either from the general public or by assessment to abutting owners. The city for its part might determine never to buy the plant at all, and this provision was obviously inserted to protect the city from any claim of damages by the owner or to injunction against alleged unreasonable or too frequent changes. The city was not to escape from the position of a purchaser when it should elect to become a purchaser, and if a private purchaser under engagement to pay for the plant its actual cost would have to assume lowering of mains to altered grades as a plant cost, then the city, when it should become a purchaser, would have to assume it too.

Now, on the question whether this expense was a plant cost, abundant testimony was taken. The testimony is overwhelming that it was. In fine, it is just because these mains were to be lowered "at the cost of the grantee" that it now becomes a cost which the purchasing city must assume under its bargain. This item accordingly was properly added to the purchase price.

Under the same assignment of error, appellant has complained of a small item of $441, allowed as reimbursement to the owner for the installation of meters. Now, these meters did not become the customers', but remained the owner's property and will pass to the city, the evidence showing that they were paid for by the company in the water allowance to consumers. This item must remain as established below.

II. On February 26, 1906, the plant was sold by the owners to the partners Garrison and Fisher, who, as we have

stated above, are not to be confounded with the respondent corporation, Garrison-Fisher Company. The purchase price was the sum of $70,000. When these partners came to buy the property, they found the cost entered on the books $63,-190. What they paid was $70,000. The difference, $6,810, was made a part of the present purchase price to the city, not for the mere reason that Garrison & Fisher had paid that amount, but because on evidence it was adjudged reasonable that they should have paid it. In other words, $70,000 was adjudged the actual cost of the plant at that time; so the lower court allowed $6,810 under this head and added to it the stipulated ten per cent, making in all $7,491.

It appears that the pipe company, while constructing the plant and before their sale to Garrison & Fisher, had failed to enter upon the books allowances for services of their higher officers, or what might be called reasonable overhead charges in the construction of the plant; and it would seem, on hasty consideration, as if, even after lapse of time, some allowances in that respect might be made. But, upon full consideration, we must sustain the objection of the city to this item. The trouble to begin with is that it is too vague. We do not question, to be sure, the good faith of Garrison & Fisher, but it is not to be forgotten that they were then interested in their own vendor, the pipe company, and that they must have dealt with this item somewhat leniently. The round number itself, $70,000, lacks precision of estimate. A rough sum was agreed upon. Nor in any of the accounting in the lower court was this item given the precision which the experts were able to give to most of the others. Moreover, the pipe company was engaged in building other plants as well as this, and the distribution or apportionment of this overhead charge is somewhat speculative. Indeed, it may well be said that these overhead items are something which the then owners not only did not pay, but actually saved. At all events, we are not satisfied that this should be included

in a contract calling for purchase at actual cost.   The item is accordingly disallowed.

III.   Both the lower court and the referee allowed $3,101 as "interest during construction" since February, 1906. This was for the period following the purchase by Garrison & Fisher, who since their purchase had made large additions out of earnings and from personal advances without issuing bonds or incurring general loans.   This item is properly allowed as one of cost of plant.   Had bonds been floated, their interest charge would manifestly have been a cost ingredient.   Now the owner is surely entitled to allowance in the same way, whether he advanced the money himself or left idle in the treasury for current and impending construction earnings which he could have taken out as dividends.   We may add that our public service commission has had to fix this kind of item in its general practice, which is as follows:

"Charge to this account all interest on loans obtained and on notes issued for money borrowed for construction purposes or for the purchase of equipment."

And the interstate commerce commission is equally emphatic:

"This account shall also include reasonable charges for interest during the construction period, on the owners' own funds used temporarily during such period for construction purposes."

We are satisfied with the findings of the lower court in this respect.

IV.   The third assignment of error is again discussed with assignments numbered 4 and 5, which we now consider.   The lower court, fixing August 1, 1914, as a date to be reckoned to, allowed respondents as cost of plant whatever had been added up to that date.   The city claims that nothing should be allowed, no improvement charge reimbursed, or profits withdrawn in this respect since April 7, 1912, when its notice of purchase matured.

This argument we have already answered.   The company is entitled to the profits until it is met by a tender.   We repeat that we are not now deciding whether tender, actual or constructive, is necessary in order to sustain this action, for the cross-complaint has placed respondent in the position of acquiescing in a sale, and if any rights remained to respondent in this respect, they were lost with its cross-appeal. But that the owner is entitled to its profits until actual tender is very clear.   Nor must it be forgotten that any terms imposed upon the city in respect to this tender can be little complained of, for the reason that specific performance is not a matter of right.   Courts prefer to leave parties the right to break their contracts and to respond in damages, the action for specific performance being a device of equity to enforce contracts of peculiar value and importance.   Wherever there is an ambiguity in the contract, though, the party seeking specific performance must regard himself as asking some degree of favor from a court of equity.   *Willard v. Tayloe*, 8 Wall. 557 ; *Hennessey v. Woolworth*, 128 U. S. 438 ; *Pope Mfg. Co. v. Gormully*, 144 U. S. 224 ; *McDaniels v. Whitney*, 38 Iowa 60.

The city of Bremerton is unfortunate in the contract which it seeks to enforce in this action, for the ambiguities of that contract are very obvious.   Nor was the city felicitous in the words in which it announced its intention to purchase, for, comparing its language with that of the contract under this head, it might well have been doubted, if the question were left open, whether the terms announced, both as to price and method of valuation, were a proper compliance with its contract.   Equally uncertain was the contract in the provision as to which three years were to be employed in computation. Under this head, therefore, we hold that appellant is in no position to press its third, fourth, or fifth assignments of error; that it is not in possession as, and has not yet become, the equitable owner.   Even those courts which have relaxed the rule of actual tender have still insisted upon one of readi-

ness, willingness, and present ability. *Coonrod v. Studebaker,* 53 Wash. 32, 101 Pac. 489; *Mills v. Huggins,* 14 N. C. 58. In *Bigler v. Morgan,* 77 N. Y. 312, the court says, at page 318:

"The refusal of the defendant to perform although it obviated the necessity of a formal tender of a deed, did not dispense with the necessity of showing that the plaintiff was able, ready and willing to perform, and ordinarily this requires that the deed called for by the contract should be prepared and ready for delivery."

See, also, *Eddy v. Davis,* 116 N. Y. 247, 22 N. E. 362.

V.  In its sixth assignment of error the city complains of the lower court's ordering a bond election, and in its seventh complains that tender was to be performed by August 1, 1915, under penalty of dismissal of this action. In the former ruling the lower court was wrong. The judicial tribunals have no such power. On the other hand, the lower court did have power to require of one obtaining a decree of specific performance that he tender payment at some reasonable date, lest the owner be forever crippled in the exercise of obligations to its stockholders and the public.

Adopting August 1, 1914, as a reckoning date, we affirm the lower court's award of $219,552.30, less the item just rejected of $6,810 with its added ten per cent. Upon the sum so reduced, respondent shall have interest at six per cent from August 1, 1914, until tender as hereinafter required; and until the completion of the sale, respondents shall retain the possession and operate the plant in the ordinary course. On tender, the city shall be entitled to a credit of the receipts and income after August 1, 1914, but less the respondent's operating costs, taxes, assessments, maintenance charges, legitimate indispensable improvements, and additions since that date.

Leaving to the city its own way of raising the purchase price, we take judicial notice that a bond election will prob-

ably be necessary, and we accordingly allowed the city four months after the remittitur of this court shall be filed below in which to make its tender or suffer dismissal of this suit. The tender shall be made by the city's depositing in the lower court one-half of the above fixed purchase price, accompanied by a certificate from the city treasurer showing a concomitant ability to pay the remainder upon the accounting now decreed from the 1st day of August, 1914, between the receipts and income on the one hand and the permitted disbursements of respondents on the other hand. Thereupon, if the parties do not agree on the precise balance, the lower court shall take accounting: The costs of this and of the lower court shall be equally divided between the parties, and shall not be an item in the purchase price.

Except as herein modified, the decree of the lower court is affirmed, and the cause is remanded for any further proceedings made necessary by this opinion.

MORRIS, C. J., MAIN, HOLCOMB, and PARKER, JJ., concur.