# ALABAMA WATER CO. et al. v. CITY OF ANNISTON.
7 Div. 172.

Supreme Court of Alabama.
Oct. 26, 1933.

Rehearing Denied Dec. 14, 1933.

580

Cabaniss & Johnston, of Birmingham, and Knox, Acker, Sterne & Liles, of Anniston, for appellants.

James Fouche Matthews, of Anniston, for appellee.

THOMAS, Justice.

The several decisions in this case are reported as City of Anniston v. Alabama Water Co., 207 Ala. 497, 93 So. 409; Alabama Water Co. v. City of Anniston, 215 Ala. 120, 110 So. 36; Id., 217 Ala. 271, 116 So. 124; Id., 223 Ala. 355, 135 So. 585.

█ We take judicial knowledge of the proceeding of that case in this court. Cogburn v. Callier, 213 Ala. 38, 104 So. 328, Catts v. Phillips, 217 Ala. 488, 117 So. 34.

This appeal is from a decree on the merits and before the reference and report of the register as a guide to that official on the accounting.

A question that is again urged on this appeal is the premature filing of the bill by the city. We adhere to the former holding on this phase of the case, Alabama Water Co. et al. v. City of Anniston, 223 Ala. 355, 360, 135 So. 585, 590.

After the last decision, the appellee, on August 8, 1931, amended its bill, basing the municipality's rights on the original contract of June 20, 1910, by Anniston Water Supply Company, as supplemented and modified by the written agreement of June 3, 1920, and presented in the answer.

In that last consideration the majority of the court modified the opinion, saying:

"An accounting is the first step to obtain knowledge of the amount to be issued and to advise the electorate of the subject-matter upon which they should speak in an election. We hold such procedure was contemplated by the parties as a part of the contract, and such contract may be specifically enforced, as others.

"A decree first ascertaining the amount payable, followed by a decree fixing a reasonable time for compliance, which should include a sufficient time for holding an election

and marketing the bonds, if approved, with a provision finally foreclosing complainant, on failure to comply, is the natural procedure in contemplation of the parties. This is the effect of our decisions on former appeals, supra.

"The accounting should include extensions, replacements, and betterments on the plant as a unit down to the date of the final decree. We are dealing with property devoted to a public service. While operated by respondents, it was and is under the supervision of the Public Service Commission, subject to the option rights of the city. No interruption of service was contemplated, no cutting off of any customers entitled to such public service, no junking of any part of the plant required for such service. It is contemplated the city shall step into the shoes of the water company as owner and as a public service agency.

"Enlargement to meet the water service requirements of a growing city has been a clear duty of the water company during the ten years this litigation has been pending. It appears the city has been itself a party to some of these enlargements, such as better and more extended fire protection, etc.

"Respondents are not to be dealt with as trustees ex maleficio from and after July 1, 1920, nor after September 30, 1920."

Mr. Justice Brown concurred, saying: "* * * * The decree of the circuit court, in so far as it granted relief on the basis of the original contract of 1910, was correct, but that appellants should have been required to account *on equitable principles, not as trustees ex maleficio*, and that the contract should be construed as embracing the entire system as within the contemplation of the parties, and that the decree of the court should be so modified as to protect the interests of both parties." (Italics supplied.)

On rehearing this opinion was modified, and the application for rehearing was overruled.

In view of this observation, we may note that a trustee ex maleficio is one who, being guilty of wrongful or fraudulent conduct is held by equity to the duty and liability of a trustee, in relation to the subject-matter, to prevent him from profiting by his own wrong. Black's Dictionary of Law; Bouvier's Law Dictionary. This is the statement, or effect, of the text of Mr. Pomeroy quoted in Kent v. Dean, 128 Ala. 600, 609, 610, 30 So. 543, 546, and Parrish v. Parrish, 33 Or. 486, 54 P. 352, to the following effect: "Such trusts, termed ex maleficio or ex delicto, are, as Mr. Pomeroy says, practically without limit, and in general, are properly applied, 'whenever the legal title to property, real or personal, has been obtained through actual fraud, misrepresentation, concealments, or through undue influence, duress, taking advantage of one's weakness or necessities, or through any other similar means or under any other similar circumstances which render it unconscientious for the holder of the legal title to retain and enjoy the beneficial interest, equity impresses a constructive trust on the property thus acquired in favor of the one who is truly and equitably entitled to the same, although he may never perhaps have had any legal estate therein; and a court of equity has jurisdiction to reach the property in the hands of the original wrongdoer, or in the hands of a subsequent holder, until a purchaser of it in good faith and without notice acquires a higher right, and takes the property relieved of the trust.' 2 Pom. Eq. Jur. §§ 1053, 1055; 1 Story Eq. Jur. § 187; Manning v. Pippen, 86 Ala. 357, 5 So. 572 [11 Am. St. Rep. 46]; Moore v. Crawford, 130 U. S. 122, 9 S. Ct. 447, 32 L. Ed. 878."

See, also, Butler v. Watrous, 185 Ala. 130, 139, 64 So. 346; Manning v. Pippen, 86 Ala. 357, 364, 5 So. 572, 11 Am. St. Rep. 46; Christy, Rec'r, v. Sill, 95 Pa. 380; Huxley v. Rice, 40 Mich. 73; Dray v. Dray, 21 Or. 59, 27 P. 223; Moore v. Crawford, 130 U. S. 122, 9 S. Ct. 447, 32 L. Ed. 878; Jones v. Van Doren, 130 U. S. 684, 9 S. Ct. 685, 32 L. Ed. 1077; Lincoln v. Wright, 4 De Gex & Jones's Rep. p. 12.

The rule of liability on a decree of specific performance and recovery in equity for such trustee is thus stated: "Every act of the trustee in holding, managing, investing, or otherwise dealing with the trust property as though he could retain it, is itself a violation of his paramount obligation to the beneficiary. If the trustee refuses or delays to convey the property to its beneficial owner, and retains it, derives benefit from its use, and appropriates its rents, profits, and income, he must account for all that he thus receives, and pay over the amount found to be due to the cestui que trust, as well as convey to him the corpus of the trust fund. The beneficiary therefore, being the true owner, may always, by means of an equitable suit, compel the trustee to convey or assign the corpus of the trust property, and to account for and pay over the rents, profits, issues, and income which he has actually received, or, in general, which he might with the exercise of reasonable care and diligence have received. In such a suit the plaintiff is also entitled to any additional or auxiliary remedy, such as injunction, cancellation, accounting, which may be necessary to render his final relief fully efficient. No change in the form of the trust property, effected by the trustee, will impede the rights of the beneficial owner to reach it and to compel its transfer, provided it can be identified as a distinct fund, and is not so mingled up with other moneys or property that it can no longer be specifically separated." 3 Pomeroy's Equity Jurisprudence (4th Ed.) § 1058.

Would this rule be harsh in its application to a case like that for decision—to account for rents, income, and profits from the filing of the plea of non est factum on June 16, 1922, though that plea was withdrawn on December 13, 1928? Each case must be adjudged by its own facts. This is of general recognition, and in the note to 3 Pomeroy's Equity Jurisprudence (4th Ed.) § 1058, Professor John Norton Pomeroy observes: "There are instances, where the trustee has acted in good faith, in which a court of equity would only hold him accountable for what he had *actually* received, and would not charge him with proceeds or profits which he might have received, nor with compound interest, etc. See Barnes v. Taylor, 30 N. J. Eq. 7; Greenwood's Appeal, 92 Pa. 181."

In Greenwood's Appeal, 92 Pa. 181, 184, 185, the court said: "The case was disposed of by the master, and the court below upon the theory that the defendant being a trustee ex maleficio, was liable, to account, *not for what he received for the oil, but for what he might have received for it.* No authority was cited for this proposition, except those referred to by the plaintiff's counsel before the master, and which do not apply. They were cases of technical trusts, or of the conversion of stocks deliverable upon a particular day. The distinction between such cases and the one in hand is manifest. The defendant was lawfully operating a well in which he had a joint interest with the plaintiff. It was his duty, as settled by the former decree of this court, to account to plaintiff for the proceeds of half the oil. Under such circumstances there is no rule of law or equity which would make him responsible for the highest market price of the oil upon the days on which it was turned into the pipe lines. In the absence of fraud or bad faith in the sales, neither of which is pretended, *the true measure of damages would be the actual sales.*" (Italics supplied.)

In the last opinion rendered by this court it was held said respondents are not to be dealt with as trustees ex maleficio; that there should be an accounting; that the city has not been in position to make tender and demand a deed with the right of possession; that the purchase price "can be paid only with the aid of a bond issue" that was "approved by the electors" in 1926, and whether this "is adequate is not yet known"; that respondents have been under "legal duty to retain possession and render the public service to which the property has been devoted."

The rule of Pearce v. Third Ave. Improvement Co., 221 Ala. 209, 214, 128 So. 396, 400, was said to have some application to the case at bar. It was there observed:

"In applying equitable principles in fixing the terms of specific performance, one recognized rule is that the vendor in default shall not be rewarded for his own fault. On the

other hand, specific performance is what the term implies—enforcement of the contract as nearly as may be to accomplish its purpose. The vendee is not due specific performance and also damages as for its breach.

"Damages are awarded, if at all, in adjusting the equities incident to proper relief by way of specific performance in the particular case.

"Accordingly, the vendee is not entitled to have the use of both the purchase money and the property pending enforcement of the contract."

In the last opinion (223 Ala. 362, 135 So. 585, 591), after citing the Pearce Case, supra, it was observed:

"Respondents, who have long resisted the right to specific performance, thereby causing delay in decreeing complainant the relief to which it is found entitled, cannot be permitted to profit by such delay; this without regard to any question of good faith in the litigation. The fact that the complainant has been denied the profits which the decree for relief determines were its due is the controlling factor. It follows that an accounting for profits should be had. The accounting should date from the filing of the plea of non est factum. If found to exceed the interest on the purchase price including cost of betterments as per contract, the city should be given the benefit of same in the final decree.

"We will not go into further detail. In framing the decree, the great principle, 'equality is equity,' should be kept in mind.

"No inequality results from enhanced market value of the plant, if any, at the time. By the original as well as supplemental contract the city was to get the benefit of such advancement."

There is some analogy to be found in the power employed, of specific performance of the sale of land by a court of equity; yet the cases are different. In one (this case) the sale of an operating public utility and its properties is the subject, and in the other the purchase of a lot of land in the city was the subject-matter.

What, then, are the "equitable principles" or "equality in equity" that should be applied by the register on the reference, where the respondent-appellant was not required to account as a trustee ex maleficio, and where the required operation was that of a public utility so vital to the necessities, conveniences, and health of the residents of and near that municipality? The status quo presents a case that is in nature sui generis, and which imposes its own limitations, duties, and liabilities.

The rule of respective duties and compensations cannot be as that in the case of a mere vendor of land under contract of sale, who is compelled in the performance, by a court of

equity, to account to the purchaser for the reasonable market and rental value of the property so withheld and for the time covered by the litigation. Appellants' counsel insist that the accounting indicated by the last decision "for rents and profits" would require the appellant and operator of the public utility to deliver to the vendee of the plant, not only the right to the possession of land, but the profits of such going business—not money as the returns from the occupancy that was withheld, but the capital risked and the skill exercised in its management, for the time required in the bona fide determination and consummation of the right of specific performance of the contract of purchase of the unusual character of property and public utility.

The purchase price has never been fixed, and, under general authorities, there is no duty to account *for profits* accruing prior to the time when there is an ascertainment of the purchase price, and therefore a duty under the law of the case to make conveyance. However this is, the city could not comply with the terms of purchase before the authorization of the issue of the bonds to be used in payment or part payment of the properties, which was in 1926, and the plea in question was withdrawn by the answer of December 13, 1928.

In National Waterworks Co. v. Kansas City (C. C. A.) 62 F. 853, 863, 27 L. R. A. 827, Mr. Brewer said: "We dissent in toto from the claim of the city that at the lapse of the 20 years the title to this property, with the right of possession, passed absolutely to it, without any payment or tender of payment, leaving only to the company the right to secure compensation by agreement or litigation, as best it could. Much was said in argument of the relative rights of lessor and lessee to buildings erected during the term of the lease. The city and the company were called licensor and licensee, and it was insisted that, as the right to operate was to cease at the expiration of 20 years, the relation was equivalent to that of lessor and lessee; that full title and right of possession passed instantly to the city, leaving all questions of amount and time and manner of payment to be subsequently determined. Much was said, too, about the rule of construction of public grants; that rule being that the grants are to be construed favorably to the public, and unfavorably to the grantee. It is unnecessary to attempt to define the peculiar quality of the title held by the company, nor do we question the rule of construction of public grants; but all contracts involving property rights and obligations between municipalities and individuals must be presumed to be based upon and to recognize the ordinary laws of business transactions, and, if any departure therefrom is contemplated, such departure must be clearly manifested. Now, the familiar and ordinary law of business transactions is that he who parts with title receives, at the time, payment. In other words, payment of price and transfer of property are contemporaneous and concurrent acts. When it is affirmed that a contract made by a municipality contemplates that he whose money builds and constructs, and therefore establishes title to, property, shall surrender his title and possession without payment, or even the amount thereof determined, the language compelling such a construction must be clear and imperative. There is no such language in either the act or the ordinance. While it is true that the act provides that no grant so made shall confer the right to operate the waterworks for any period beyond 20 years, yet such provision is no more imperative than the one that at the expiration of the 20 years the city shall purchase and pay therefor. If the city fails to purchase and pay, its acquires no title, no right of possession, to the property of the water works. There is no language which would justify the court in saying that it is clearly expressed that the purpose of this contract and the thought of the legislature were to vest the title and right of possession in the city at the end of 20 years, leaving to future litigation the fixing of the amount and the enforcing of the fact of payment. If at the expiration of the 20 years the city had tendered to the company, in payment for the property, an amount admitted or found to be 'the fair and equitable value,' doubtless the right of the city to the possession and future earnings would have immediately accrued, and the present decree would have been based upon such transfer of right, but no such tender was made. In so far, therefore, as the decree of the circuit court attempted to transfer the title and the possession to the city before payment, we are constrained to hold that it was erroneous."

And in City of Bremerton v. Bremerton Water & Power Co., 88 Wash. 362, 367, 371, 372, 373, 153 P. 372, the court considered an option reserved in a franchise under which the municipality reserved the right to purchase the city waterworks system at the expiration of ten years on a basis of twelve and one-half times the net annual revenue. In the absence of agreement, the amount was to be determined by appraisal. The city elected to buy in 1912. The controversy arose as to the rights of the city to buy, which passed out of the case because of defendant's failure to perfect its cross-appeal, and also as to the price fixed by the court. The city contended that, from the time of its election to purchase, "the property belonged to the city," and that the latter should be credited with the profits of operation and in equity regarded as the owner from the date of its election.

It was there observed (88 Wash. pages 367, 371, 372, 373, 153 P. 372, 374):

584

"The city's contention is that no tender was necessary before suit, that from the time of its decision and announcement to buy the property in equity belonged to the city, and that from April 7, 1912, the city should be allowed the profits of the plant. But, even if precedent tender be not necessary to sustain this action (a question which has now disappeared with the cross-appeal in any event, and which possibly disappeared when the cross-complaint was filed), it does not follow that tender can be ignored in dating valuation. The city admittedly did not have the means ready for a purchase when it began this action, nor has it ever had them since, and this court must assume that it could raise this money only by issuing bonds which might be refused by the people at the polls, or fail of sale in the market. Without reckoning, then, delays from the opposition of the owner, we must bear in mind the uncertainty of the purchaser. The owner is clearly entitled to possession until the purchaser is actually ready to pay; for the property is his until he is paid. By some accident the plant might be ruined or extensively impaired, in which event the city would surely not accept it. Accordingly the owner, having the burdens of ownership, is surely entitled to its profits. * * *

"The lower court, fixing August 1, 1914, as a date to be reckoned to, allowed respondent as cost of plant whatever had been added up to that date. The city claims that nothing should be allowed, no improvement charge reimbursed, or profits withdrawn in this respect since April 7, 1912, when its notice of purchase matured.

"This argument we have already answered. The company is entitled to the profits until it is met by a tender. We repeat that we are not now deciding whether tender actual or constructive is necessary in order to sustain this action; for the cross-complaint has placed respondent in the position of acquiescing in a sale, and, if any rights remained to respondent in this respect, they were lost with its cross-appeal. But that the owner is entitled to its profits until actual tender is very clear. Nor must it be forgotten that any terms imposed upon the city in respect to this tender can be little complained of, for the reason that specific performance is not a matter of right. Courts prefer to leave parties the right to break their contracts and to respond in damages; the action for specific performance being a device of equity to enforce contracts of peculiar value and importance. Wherever there is an ambiguity in the contract though, the party seeking specific performance must regard himself as asking some degree of favor from a court of equity. Willard v. Tayloe, 8 Wall. 557, 19 L. Ed. 501; Hennessy v. Woolworth, 128 U. S. 438, 442, 9 S. Ct. 109, 32 L. Ed. 500; Pope Mfg. Co. v. Gormully, 144 U. S. 224, 236, 12

S. Ct. 632, 36 L. Ed. 414; McDaniels v. Whitney, 38 Iowa, 60, 70. * * *

"Even those courts which have relaxed the rule of actual tender have still insisted upon one of readiness, willingness, and present ability. Coonrod v. Studebaker, 53 Wash. 32, 101 P. 489; Mills v. Huggins, 14 N. C. 58. In Bigler v. Morgan, 77 N. Y. [312], the court says, at page 318:

" 'The refusal of the defendant to perform, although it obviated the necessity of a formal tender of a deed, did not dispense with the necessity of showing that the plaintiff was able, ready, and willing to perform, and ordinarily this requires that the deed called for by the contract should be prepared and ready for delivery.'

"See, also, Eddy v. Davis, 116 N. Y. 247, 22 N. E. 362."

The decision in Pearce v. Third Ave. Improvement Co., 221 Ala. 209, 128 So. 396, which is cited in the opinion of Justice Bouldin as supporting the proposition as the basis for accounting, affords no basis of accounting provided by this decree. In that case it is correctly stated that the relation between vendor and vendee is that of mortgagor and mortgagee in the matter of accounting *for profits only from the time when the vendee is entitled to possession of land.*

■ The character of the property as a public utility and the contract duty under the law, of its continued and efficient operation and necessary maintenance, present difficulties in the application of the rules that usually obtain and are applied to specific performance of the sale of mere lands and buildings thereon. It was agreed that payments on the purchase price may be by the city's assumption of certain of the water company's bonded indebtedness and issue of municipal bonds in amounts indicated. This the city must have been ready, able, and willing to do before there could have been compliance or ability to comply on its part, as it had contracted to do. The city was not in that respect required to do an unnecessary act or formality in the light of the record and history of this litigation in this court; and it is immaterial that the municipal bonds in question, though authorized to that end by the electorate, were never actually issued, tendered, or formally assumed as to respondents and the holder of its bonds, as an actual payment pro tanto, or as a condition precedent to its success and recovery in this suit. At no time before the ascertainment of the indebtedness could the city make tender and demand a deed with the right of possession; yet it was required to have been ready and have the ability so to do on the ascertainment of the amount due.

The decree of the trial court has well covered the material issues, as a guide to the register on an accounting pursuant to the last decision and equities of the case. Ala

bama Water Co. v. City of Anniston, 223 Ala. 355, 135 So. 585, 591.

We are of opinion that this court was in error in directing that the accounting for interest and net profits "should date from the filing of the plea of non est factum." We think that any interest due by the city should be offset by virtue of the use of the plant by the water company, and the question of profits in the operation of same is not to be considered. In other words, the city should pay the base price, $400,000, plus the cost or value of the betterments, and extension of the plant, less the value of the deterioration as fixed by the contract, and the trial court will fix a reasonable time within which the amount is to be ascertained and tendered as a condition precedent to relief.

The costs of this appeal are taxed against the parties in equal parts.

The decree of the circuit court is corrected, and as corrected is affirmed, and the cause is remanded for further proceedings in accordance with the principles above stated.

Corrected and affirmed and remanded.

ANDERSON, C. J., and BROWN and KNIGHT, JJ., concur.

GARDNER and FOSTER, JJ., concur in the correction of the decree as herein indicated, but prefer to reserve for themselves the matter of premature filing of the bill as indicated in their views expressed on the last appeal.

BOULDIN, Justice (dissenting).

I am not sure upon what ground the majority opinion relieves the city of interest as per contract on one hand and the water company from accounting for net profits on the other.

That complainant must aver and prove he is ready, able, and willing to perform is a well-known condition to specific performance.

But on last appeal, following former decisions in this cause, we defined such requirement as applied to this case. The contract contemplated an accounting to ascertain the amount to be tendered and approval of a bond issue before the actual completion of the transaction.

The fact that the city has never known what amount to tender, and need not make ready therefor until a decree in this cause fixes the amount, has been definitely held not to stand in the way of specific performance. I do not understand the present opinion to overrule former decisions on this point.

How, then, can this failure to make tender or have funds in hand affect the amount which in equity should be paid on specific performance?

The kind of property, the conduct of a going business therewith, and profits earned by reason of special skill and financial management, may present equities that should be considered when writing a final decree with all the evidence in.

A decree relieving the city from all interest, I submit, is the making of a new contract in that regard; not a specific performance of the contract made by the parties.

To arbitrarily set off this interest charge against net profits, balancing one against the other, may be equitable, but how does this court know this to be true without evidence?

The fundamental aim of specific performance is to put both parties, as nearly as practical, in the position they would have been if performance had been effected within a reasonable time as contemplated.

For thirteen years respondent has assiduously resisted specific performance. Without questioning the right to litigate, nor the good faith of same, still our repeated decisions have held no sufficient defense has been presented. Although not a trustee ex maleficio, yet a relation of trustee and cestui que trust, in equity, has subsisted during all these years.

The present decree, therefore, seems to me to set a dangerous precedent; to offer a reward to litigation which may assure great profits, although ultimately found to be without merit.

If it be said each case should stand on its own equities, I fully agree; but no decree can be justified on that ground without knowing the equities of the particular case.

I therefore adhere to the carefully considered opinion of this court on last appeal, Alabama Water Co. v. City of Anniston, 223 Ala. 355, 135 So. 585.