Goodwyn, Mills Cawood, Inc. ("GM C"), an engineering firm, appeals from the trial court's order granting Markel Insurance Company's motion to enforce a settlement agreement and denying GM C's petition to reform the same agreement. We affirm in part, reverse in part, and remand.
 I.
In October 1997, the Town of Vance solicited bids for a sewer-improvement project. The plans for the project were prepared by GM C. Bids were taken to determine the general contractor for the project, and Mountain Movers, LLC, was the low bidder. Vance awarded it the general contract. The contract required Mountain Movers to provide a payment bond and a performance bond for Vance. Markel Insurance Company issued those bonds. Under the terms of the bonds, Markel would be held responsible for the performance of the contract and for Mountain Movers' debts if Mountain Movers defaulted on its contract with Vance.
During construction of the project, a dispute arose between Mountain Movers and Vance. Mountain Movers claimed that it was entitled to additional compensation and to additional time to complete the project because of alleged deficiencies in the plans prepared by GM C and because of extra work on the project Vance was requiring. The parties were unable to resolve their differences, and, in July 1998, Mountain Movers abandoned the sewer-improvement project.[1] Vance requested *Page 1046 
that Markel perform its obligations under the payment and performance bonds it had issued, but Markel refused to do so.
In January 1999, Mountain Movers sued Markel, GM C, and Vance in the Tuscaloosa Circuit Court, asserting numerous claims including negligence, breach of contract, tortious interference with business and contractual relations, and fraud. Markel counterclaimed against Mountain Movers and cross-claimed against GM C and Vance. On November 8, 2000, after extensive discovery and settlement negotiations, Markel, Vance, and GM C entered into a settlement agreement; that agreement resolved all of the outstanding claims among the parties to the agreement. The only claims remaining were Mountain Movers' claims against Markel and Markel's counterclaims against Mountain Movers.[2] The settlement agreement stated in relevant part that "[GM C] agrees to pay to Markel, as surety for Mountain Movers, LLC, the sum of [$275,000], said sum to be paid as settlement in full of all claims, actions, demands, and assertions of liability of any nature whatsoever by Mountain Movers . . . and Markel against [GM C]." Markel also agreed to pay Vance $250,000 in satisfaction of all claims under the performance bond issued by Markel. The agreement declared that all other claims between the parties to the settlement agreement were released and discharged. In a supplemental agreement, the parties agreed to defer their payment obligations under the settlement agreement until Mountain Movers' claims against Markel were resolved.
On October 3, 2001, before Mountain Movers' claims against Markel were resolved, and before any payments had been made pursuant to the settlement agreement, GM C's insurer, Reliance Insurance Company of Illinois, Inc., was determined to be insolvent and entered liquidation proceedings in Illinois. On November 6, 2001, although Mountain Movers' claims against Markel remained pending and the payments called for in the settlement agreement presumably were not yet due, Markel paid Vance the $250,000 it had agreed to pay under the settlement agreement.[3] GM C refused to make the $275,000 payment to Markel called for under the settlement agreement, claiming that Reliance Insurance Company, not GM C, was obligated to fund that payment to Markel.
On February 12, 2002, Markel moved the trial court to enforce the settlement agreement against GM C. On February 26, 2002, the trial court entered a summary judgment for Markel on all of Mountain Movers' claims against it; on April 9, 2002, the trial court made its February 26, 2002, order final pursuant to Rule 54(b), Ala. R. Civ. P. On April 17, 2002, GM C petitioned the trial court to reform the settlement agreement to reflect the true intent of the parties, arguing that the parties' true intention had been for Reliance Insurance Company to fund the $275,000 payment to Markel and that the agreement did not accurately reflect that intent. On May 6, 2002, the trial court held an evidentiary hearing to consider Markel's motion and GM C's petition. On May *Page 1047 
22, 2003, the trial court granted Markel's motion to enforce the settlement agreement and denied GM C's petition to reform the settlement agreement. The court also entered a judgment in favor of Markel and against GM C for $275,000 with interest calculated at 12% from November 6, 2001, the date Markel made the payment it was obligated to make to Vance under the settlement agreement. The trial court denied GM C's motion to alter, amend, or vacate its order. GM C appealed.
 II.
The parties disagree as to the applicable standard of review. Markel argues that, because the trial court conducted an evidentiary hearing at which it heard oral testimony without a jury, the ore tenus rule should apply; therefore, the trial court's decision should not be overturned unless it is "manifestly unjust or plainly and palpably erroneous." Brewer v.Stanley, 534 So.2d 299, 300 (Ala. 1988). However, GM C argues that, because the trial court's decision was based almost exclusively on deposition testimony, affidavits, and exhibits, our review should be de novo. See Rogers Found. Repair, Inc. v.Powell, 748 So.2d 869, 871 (Ala. 1999) ("When a trial judge's ruling is not based substantially on testimony presented live to the trial judge, review of factual issues is de novo.").
In this case the appropriate standard of review is de novo review. The parties agree that the facts are not in dispute. As we stated in Philpot v. State, 843 So.2d 122, 125 (Ala. 2002), "[t]he ore tenus rule does not apply to cases involving undisputed facts." Moreover, while three witnesses did provide brief testimony at the May 6, 2002, evidentiary hearing, the trial court advised the parties that they should submit affidavits and that the trial court would treat the matter as one in which a motion for a summary judgment has been made. It is well-settled that we review a trial court's summary judgment de novo. Sessions v. Espy, 854 So.2d 515, 521 (Ala. 2002).
 III.
GM C argues (1) that the trial court erred in denying its motion to reform the settlement agreement; (2) that the trial court erred in enforcing the settlement agreement against it when, GM C says, (a) the delay in funding the settlement until after Reliance Insurance Company entered liquidation was caused by Markel, and (b) Markel could have sought recovery from the Illinois Insurance Guaranty Fund; and (3) that the trial court erred in awarding interest on its judgment at a rate of 12% and measured from the date of Markel's payment to Vance.
For the reasons set forth below, we affirm the trial court's order denying GM C's motion to reform the settlement agreement. We also affirm the trial court's order enforcing the settlement agreement against GM C. However, because the trial court's award of interest was erroneous, we reverse that part of the trial court's order and remand the case for further proceedings consistent with this opinion.
 Reformation of Settlement Agreement
In Alabama, reformation of contracts is governed by § 8-1-2, Ala. Code 1975; that Code section provides:
 "When, through fraud, a mutual mistake of the parties or a mistake of one party which the other at the time knew or suspected, a written contract does not truly express the intention of the parties, it may be revised by a court on the application of the party aggrieved so as to express that intention, so far as it can be done without prejudice to the rights *Page 1048 
acquired by third persons in good faith and for value."
This Court has stated that "[t]he terms of the statute [§ 8-1-2] are plain and unambiguous and give the equity court power to reform or revise a written contract only when the requirements of the statute have been met." American Liberty Ins. Co. ofBirmingham v. Leonard, 270 Ala. 17, 21, 115 So.2d 470, 473
(1959). Moreover, it is the burden of the party seeking reformation to establish by clear and convincing evidence that those requirements have been met. Clemons v. Mallett,445 So.2d 276, 279 (Ala. 1984). GM C argues that it has produced clear and convincing evidence establishing that the true intention of the parties was for Reliance Insurance Company, not GM C, to fund the $275,000 payment to Markel that the settlement agreement requires GM C to pay, and that the failure of the settlement agreement to reflect that intention is due either to a mutual mistake of the parties or to a mistake on GM C's part of which Markel knew or suspected.
The settlement agreement states that "[GM C] agrees to pay to Markel . . . the sum of [$275,000]. . . ." (Emphasis added.) Nowhere in the settlement agreement is Reliance Insurance Company mentioned.[4] In spite of the absence of any mention of Reliance Insurance Company, GM C argues that it was the parties' true intention for Reliance Insurance Company to make the $275,000 payment the settlement agreement provides that GM C would make to Markel. In support of this proposition, GM C has produced evidence indicating that all of the parties knew that Reliance Insurance Company was providing insurance coverage to GM C. The other parties to the settlement negotiations (Vance and Mountain Movers) have acknowledged that they knew Reliance Insurance Company was to pay the amount required to be paid by GM C pursuant to the settlement agreement; however, Markel denies being aware of that fact. GM C argues that Markel's denial is not credible.[5] However, regardless of what knowledge Markel had of Reliance Insurance Company's role in the settlement, GM C has not established by clear and convincing evidence that Markel's intention in executing the settlement agreement was to look only to Reliance Insurance Company for payment of the $275,000 it was due.
It may be true that Markel expected that the $275,000 payment ultimately would be funded by Reliance Insurance Company. However, as Markel notes in its brief, "it is one thing to expect that proceeds of a Settlement Agreement would be funded by insurance, and quite another to agree to forgive and excuse a settling party's obligation in the event that insurance proceeds are not available." GM C has presented no evidence, much less clear *Page 1049 
and convincing evidence, indicating that it was Markel's intention to adopt such a forgiving posture.
The Court of Appeals in Hyatt v. Ogletree, 31 Ala.App. 8, 11,12 So.2d 397, 399 (1942), stated:
 "[T]o entitle a complainant to [reformation of a contract], the proof must be clear, exact and convincing that the intention and agreement [the complainant] would have substituted in the instrument was, in fact, that of both parties thereto. If the proof is uncertain in any material respect, relief will be denied. Kelley v. Spencer, 213 Ala. 612, 105 So. 802 [(1925)]; Lipham v. Shamblee, 205 Ala. 498, 88 So. 569 [(1921)]."
Even if GM C intended that Reliance Insurance Company, and not it, would make the $275,000 payment to Markel, there is no clear and convincing evidence indicating that this intention "was, in fact, that of both parties." Indeed, the inference to be drawn from the evidence before this Court, including the plain language of the settlement agreement, is that it was Markel's intention in signing the settlement agreement to bind GM C. If GM C's obligation was satisfied by Reliance Insurance Company, so be it; what was important to Markel was that it would receive the $275,000 GM C agreed to pay, not who paid it.
GM C also argues that the settlement agreement should be reformed because, it says, its attorney, Bruce Rogers, had no authority to bind GM C to the payment obligation of the settlement agreement. In support of this argument, GM C has presented evidence indicating that GM C never authorized Rogers to obligate it to pay any amount in connection with this action. Pursuant to the rule established in Blackwell v. Adams,467 So. 680, 684-85 (Ala. 1985), GM C might well have had a basis on which to ask the trial court to rescind the settlement agreement. ("`Although an attorney of record is presumed to have his client's authority to compromise and settle litigation, judgment entered upon an agreement by the attorney may be set aside on affirmative proof that the attorney had no right to consent to its entry. . . .'" (quoting Bradford Exchange v. Trein'sExchange, 600 F.2d 99, 102 (7th Cir. 1979))). However, GM C has consistently maintained that the settlement agreement should be enforced. Indeed, in its initial brief to this Court, GM C states:
 "It has been the consistent position of both parties that the Settlement Agreement is enforceable and should be enforced. Thus, neither party requested that the trial court rescind the Settlement Agreement. The only issue is whether the $275,000 payment obligation is enforceable against GM C or Reliance."
As we stated in Norman v. Bozeman, 605 So.2d 1210, 1214 (Ala. 1992), "[o]ur review is limited to the issues that were before the trial court — an issue raised on appeal must have first been presented to and ruled on by the trial court." Because the trial court was never asked to rule on whether Rogers's lack of authority to bind GM C mandates that the settlement agreement be rescinded, that issue is not before us.
What we can affirmatively state, however, is that this Court will not reform a settlement agreement on the ground that the attorney was not authorized to settle the dispute. A court has power to reform a contract "only when the requirements of [§8-1-2, Ala. Code 1975] have been met." Leonard, 270 Ala. at 21,115 So.2d at 473. GM C has not established that those requirements are met. Because GM C has failed to show by clear and convincing evidence that it was entitled to reformation *Page 1050 
of the settlement agreement pursuant to § 8-1-2, we cannot say that the trial court erred in denying GM C's motion for reformation, and we affirm the trial court's order on that point.
 Enforcement of Settlement Agreement Against GM C
GM C next argues that the trial court erred in enforcing the settlement agreement against GM C because (1) Markel caused the delay in the payment of the amounts due under the settlement until after Reliance Insurance Company had entered liquidation and (2) Markel could have sought recovery from the Illinois Insurance Guaranty Fund.
GM C's argument that it should be relieved of its obligation under the settlement agreement because Markel "caused" the funding of the settlement to be delayed is without merit. GM C blames Markel for the delay in funding the settlement; however, the supplemental agreement provides that payment under the settlement agreement is not due until Mountain Movers' claims against Markel are resolved. GM C itself is a party to the supplemental agreement, and while GM C may have agreed to the delay only because Markel insisted on it, GM C nevertheless did agree to it. GM C cannot now hold Markel liable for a delay to which it earlier agreed.
GM C's argument that the trial court erred in enforcing the settlement agreement against it because Markel could have sought recovery from the Illinois Insurance Guaranty Fund is likewise without merit. While Markel disputes that it has a right to recover from the Illinois Insurance Guaranty Fund, whether it has such a right is not relevant to this Court's decision when the clear terms of the settlement agreement establish that Markel is entitled to recover from GM C. It may be that Markel could have pursued a claim with the Illinois Insurance Guaranty Fund; however, GM C has cited no statute, caselaw, or contractual obligation that would require Markel to abandon its claim against GM C and seek payment solely from the Illinois Insurance Guaranty Fund.
 Interest Calculation
Finally, GM C argues that the trial court erred in awarding Markel interest on the $275,000 judgment "calculated at 12% per annum from the date of Markel's payment to the Town of Vance." GM C first argues that interest on the judgment should not be calculated from the date of Markel's payment to Vance. Under §8-8-8, Ala. Code 1975, a party is entitled to interest on a contract claim "from the day such money . . . should have been paid." The supplemental agreement provides that the parties were not obligated to fund the settlement until a final judgment was entered by the trial court. Thus, notwithstanding the fact that Markel voluntarily made its payment to Vance on November 6, 2001, GM C was not obligated to pay Markel until April 9, 2002 — the date the trial court made final its order entering a summary judgment for Markel on all of Mountain Movers' claims. Pursuant to § 8-8-8, April 9 was the day the payment "should have been paid." Accordingly, it was error for the trial court to order that interest be calculated from the date of Markel's early payment to Vance, which was made before GM C's payment to Markel was due.
GM C also argues that the interest rate applied by the trial court — 12% — is too high. GM C points out that the parties agreed in the supplemental agreement that the settlement proceeds would "draw interest at the prime rate pending appeal and final determination of all issues *Page 1051 
in this case." This Court considered a similar appeal inSoutheast Enterprises, Inc. v. Byrd, 720 So.2d 873 (Ala. 1998). In Byrd, a junior mortgagee sought to redeem a property from the party that had purchased it at a foreclosure sale. In computing the redemption price to be paid by the junior mortgagee, the trial court computed interest at the rate of 12%. On appeal, the junior mortgagee argued that the trial court should have applied the contract rate of interest instead of the fixed legal rate. We concluded:
"§ 8-8-10 . . . provides:
 "`Judgments for the payment of money, other than costs, if based upon a contract action, bear interest from the day of the cause of action, at the same rate of interest as stated in said contract; all other judgments shall bear interest at the rate of twelve (12) percent per annum. . . .'
 "(Emphasis [omitted].) This language provides for application of the contract rate or, if there is no contract rate, a fixed rate. When used to compute a redemption price, § 8-8-10, like former § 8563 [Ala. Code 1923], prevents windfalls by providing mortgagees only the amount of interest they contracted for with the mortgagor, not a higher fixed rate. Without clear direction from the Legislature, we will not provide a bonus of interest in excess of that contracted for by the mortgagees. On remand, the trial court should apply the contract rate of interest, not the 12% rate, to those portions of the redemption price composed of debts for which the interest rate is set by contract."
720 So.2d at 876-77 (footnote omitted).
Although the present case does not involve a mortgage, the legal principle is the same. GM C and Markel had contracted for a specific rate of interest. Because they had agreed that the settlement proceeds should "draw interest at the prime rate pending appeal and final determination of all issues in this case," the trial court's award of 12% interest, significantly higher than the contracted rate, resulted in a windfall for Markel. Therefore, as we did in Byrd, we reverse the order of the trial court insofar as it awarded postjudgment interest at the rate of 12%. On remand, the trial court should apply the rate of interest established in the contract,[6] namely, the prime rate.[7]
For these reasons, we reverse the trial court's order insofar as it awards Markel interest "calculated at 12% per annum from the date of Markel's payment to the Town of Vance." On remand, the trial court is instructed to enter an order awarding Markel interest calculated at the prime rate beginning on April 9, 2002, the date GM C's payment was due.[8] *Page 1052 
 IV.
GM C has failed to establish by clear and convincing evidence that the settlement agreement should be reformed on the basis that the true intention of both parties was different from that expressed by the terms of the agreement. Therefore, we affirm the trial court's order insofar as it denies GM C's motion to reform the agreement. We also affirm the trial court's order insofar as it enforces the settlement agreement against GM C. However, we reverse the trial court's order insofar as it awards Markel interest on the $275,000 judgment "calculated at 12% per annum from the date of Markel's payment to the Town of Vance." The case is remanded for the trial court to award interest in compliance with § 8-8-8 and § 8-8-10, at the rate agreed upon by the parties, that is, "at the prime rate," calculated from April 9, 2002.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
NABERS, C.J., and HOUSTON, LYONS, BROWN, JOHNSTONE, HARWOOD, WOODALL, and STUART, JJ., concur.
[1] By October 1998, Mountain Movers had stopped work on all other bonded projects and was no longer in business.
[2] Before beginning the Vance sewer-improvement project, Mountain Movers had signed an agreement assigning all of its claims against third parties to Markel upon the occurrence of default.
[3] It was not until April 9, 2002, when the trial court, pursuant to Rule 54(b), Ala. R. Civ. P., made final its order entering a summary judgment for Markel on all of Mountain Movers' claims, that, pursuant to the supplemental agreement, the payments the parties had agreed to make under the settlement agreement became due.
[4] GM C states that there is no reference to Reliance Insurance Company in the settlement agreement because the settlement agreement was drafted in pleading format so it could be submitted to the trial court for approval; therefore, only the actual parties to the litigation were included. Moreover, GM C argues that it is customary to list the actual party to the litigation as the party to the settlement agreement, even if it is understood that any payment required by the agreement will be made by the party's insurance company.
[5] GM C argues that Markel's denial is not credible because (1) Markel never sought financial information from GM C in order to determine GM C's ability to make the $275,000 payment, and (2) Markel first demanded that GM C make the payment two weeks after Reliance Insurance Company entered liquidation and before the payment was even due under the terms of the supplemental agreement.
[6] Although the settlement agreement itself did not state a rate of interest, the supplemental agreement, entered into simultaneously with the settlement agreement, provided that the settlement funds would draw interest "at the prime rate."
[7] GM C argues that an additional reason that the trial court's award of 12% interest is erroneous is that the maximum award of prejudgment interest permitted by law is 6%. See §8-8-1, Ala. Code 1975; Burgess Min. and Constr. Corp. v. Lees,440 So.2d 321, 338 (Ala. 1983) ("[T]he legal rate of prejudgment interest is 6% per annum."). However, our holding that the amount of interest should be calculated according to the lower contract rate agreed to by the parties renders moot GM C's alternative argument.
[8] GM C also argues that the trial court erred in awarding money damages and interest when Markel's only claim was for specific performance. However, whether to award specific performance is within the discretion of the trial court, and, if a trial court determines that a party has an adequate remedy in an award of money damages, that remedy is preferred. See GeneralAviation, Inc. v. Aerial Servs., Inc., 700 So.2d 1385, 1387
(Ala.Civ.App. 1997) (affirming the trial court's conclusion that the plaintiff had "an adequate remedy via money damages");Alabama Water Co. v. City of Anniston, 227 Ala. 579, 584,151 So. 457, 461 (1933) ("`Courts prefer to leave parties the right to break their contracts and to respond in damages; the action for specific performance being a device of equity to enforce contracts of peculiar value and importance.'" (quoting City ofBremerton v. Bremerton Water Power Co., 88 Wash. 362, 372,153 P.2d 372, 376 (1915))).